UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOM MARK FRANKS,<br><br>    Plaintiff,<br><br>v.<br><br>SERGEANT KIRK, *et al.*<br><br>    Defendants. | Case No. 1:15-cv-00401-EPG (PC)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL**<br><br>(ECF No. 107) |

## I. INTRODUCTION

In this civil rights action pursuant to 42 U.S.C. § 1983, Tom Mark Franks ("Plaintiff"), a prisoner in the custody of the California Department of Corrections and Rehabilitation, alleged that Deputy Sheriff Max Wigt, Lieutenant Timothy Kirk, and Deputy Sheriff Ryan Mauldin of the Stanislaus County Sheriff's Department (collectively, "Defendants") failed to protect him from an assault by a fellow inmate, Joseph Dixon ("Dixon"), in violation of the Fourteenth Amendment[1] by housing him with Dixon. (ECF Nos. 16, 17.) The parties consented to the

---

[1] Plaintiff brought his claims pursuant to the Eighth Amendment. (ECF No. 16 at 3-4.) However, as Plaintiff was convicted but not yet sentenced at the time of the assault, *see Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) ("The Eighth Amendment's prohibition of 'cruel and unusual punishments' applies only 'after conviction and sentence.'") (quoting

1

jurisdiction of the undersigned United States Magistrate Judge. (ECF Nos. 8, 25.) The action proceeded to a jury trial on June 19, 2018. (ECF Nos. 94, 96.) The jury returned a verdict in favor of Defendants and against Plaintiff on June 20, 2018, (ECF Nos. 96, 98), and Judgment was entered on June 28, 2018, (ECF No. 103).

On July 26, 2018, Plaintiff filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. (ECF No. 107.) Plaintiff contends that a new trial is warranted because the jury's verdict that housing Plaintiff with Dixon did not put Plaintiff at a substantial risk of suffering serious harm goes against the weight of the evidence presented at trial. *Id.* On September 12, 2018, Defendants filed an opposition to the motion, arguing that the jury's verdict was consistent with and supported by the evidence. (ECF No. 109.) On September 21, 2018, Plaintiff filed a reply. (ECF No. 110.)

The Court heard oral argument on the motion on September 28, 2018. (ECF No. 111.) For the reasons set forth below, the motion for a new trial is denied.

## II. BACKGROUND

Plaintiff filed the Complaint commencing this action in the United States District Court for the Northern District of California on March 2, 2015. (ECF No. 1.) The case was transferred to the Eastern District of California on March 10, 2015. (ECF No. 4.) On April 12, 2016, pursuant to its authority under 28 U.S.C. § 1915A, the Court dismissed the Complaint with leave to amend. (ECF No. 15.)

On May 9, 2016, Plaintiff filed the operative complaint. (ECF No. 16.) Plaintiff alleged that on October 25, 2014, he was attacked and cut several times by Dixon while detained at Modesto Public Safety Center/Jail in the custody of Stanislaus County Sheriff's Department. Approximately one and a half years before October 25, 2014, Dixon pulled a razor-knife on Plaintiff, and the two were separated.

---

*Graham v. Connor*, 490 U.S. 386, 393 & n. 6(1989) and citing *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977)), his claims were evaluated under the Fourteenth Amendment.

2

Plaintiff further alleged that Defendants knew that Dixon posed a substantial risk of serious harm to Plaintiff, but they failed to protect Plaintiff by housing Plaintiff with Dixon. Approximately three weeks prior to October 25, 2014, Plaintiff informed Defendant Wigt about the prior razor-knife incident, and asked not to be in the same cell with Dixon. Plaintiff also alleged that he requested a change of cell classification from Defendant Kirk, who had access to Plaintiff's entire history, including the prior razor-knife incident with Dixon. Several of Plaintiff's requests to Defendant Kirk were intercepted by Defendant Mauldin, who failed to forward the emergency requests.

The Court screened the operative complaint on September 6, 2016, and found that Plaintiff had alleged cognizable claims against Defendants. (ECF No. 17.) Defendants filed a motion for summary judgment on August 31, 2017. (ECF No. 46.) On February 12, 2018, the Court denied Plaintiff's motion for summary judgment. (ECF No. 53.)

On June 19, 2018, the action proceeded to a jury trial that continued for two days. (ECF Nos. 94, 96.) Plaintiff was represented by appointed pro bono counsel Justin A. Palmer, Esq., and Defendants were represented by Eric Daniel Farrar, Esq.

Plaintiff testified on his own behalf, and called as witnesses Joseph Dixon and Defendants. (ECF No. 97.) Defendants also testified on their own behalf. *Id.*

The Court provided the following jury instruction at trial:

> As previously explained, the plaintiff has the burden of proving that the acts of the defendant deprived the plaintiff of particular rights under the United States Constitution. In this case, the plaintiff alleges the defendants deprived him of his rights under the Fourteenth Amendment to the United States Constitution by housing him with Joseph Dixon.
>
> Under the Fourteenth Amendment, a person detained before conviction and sentencing has the right to be protected while in custody. In order to prove the defendant deprived the plaintiff of this right, the plaintiff must prove the following additional elements by a preponderance of the evidence:

1. The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

2. Those conditions put the plaintiff at substantial risk of suffering serious harm;

3. The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

4. By not taking such measures, the defendant caused the plaintiff's injuries.

With respect to the third element, the defendant's conduct must be objectively unreasonable.

(ECF No. 99 at 15).

The jury returned the following verdict on the questions submitted by the Court:

**Question 1**:
Did housing the plaintiff with Joseph Dixon put the plaintiff at substantial risk of suffering serious harm?
Yes_____          No___X____
 If you answered "Yes" to Question 1, please proceed to Question 2.
 If you answered "No" to Question 1, please skip the remaining questions, proceed to page 4, sign and date this verdict form, and return it to the court.

**Question 2:**
Did defendant make an intentional decision with respect to housing the plaintiff with Joseph Dixon?
Timothy Kirk                    Yes_____               No_____
Ryan Mauldin                   Yes_____               No_____
Max Wigt                         Yes_____               No_____
 If you answered "Yes" to Question 2 as to any defendant, please proceed to Question 3, as to that/those defendant(s) only.
 If you answered "No" to Question 2 as to all defendants, please skip the remaining questions, proceed to page 4, sign and date this verdict form, and return it to the court.

**Question 3:**
Did defendant fail to take reasonable available measures to abate the substantial risk of serious harm, even though a reasonable

4

officer in the circumstances would have appreciated the high degree of risk involved?

| | | |
|---|---|---|
| Timothy Kirk | Yes_____ | No_____ |
| Ryan Mauldin | Yes_____ | No_____ |
| Max Wigt | Yes_____ | No_____ |

If you answered "Yes" to Question 3 as to any defendant, please proceed to Question 4, as to that/those defendant(s) only.

If you answered "No" to Question 3 as to all defendants, please skip the remaining questions, proceed to page 4, sign and date this verdict form, and return it to the court.

**Question 4:**
Did defendant's failure to take reasonable available measures cause the plaintiff's injuries?

| | | |
|---|---|---|
| Timothy Kirk | Yes_____ | No___X___ |
| Ryan Mauldin | Yes_____ | No___X___ |
| Max Wigt | Yes_____ | No___X___ |

If you answered "Yes" to Question 4 as to any defendant, please proceed to Question 5, as to that/those defendant(s) only.

If you answered "No" to Question 4 as to all defendants, please skip the remaining questions, proceed to page 4, sign and date this verdict form, and return it to the court.

**Question 5:**
What amount of damages, if any, do you award to the plaintiff?
Amount: $ ____**0**_____

If you find that the amount of damages is $0, please proceed to Question 6 and Question 7.

If you find that the amount of damages is more than $0, please proceed to Question 7 only.

**Question 6:**
What amount of nominal damages do you award to the plaintiff? Nominal damages may not exceed $1.
Amount: $ ____**0**_____

**Question 7:**
Do you find that defendant's failure to protect the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's constitutional rights?

| | | |
|---|---|---|
| Timothy Kirk | Yes_____ | No___X___ |
| Ryan Mauldin | Yes_____ | No___X___ |
| Max Wigt | Yes_____ | No___X___ |

(ECF No. 98.)

Pending now before the Court is Plaintiff's motion for a new trial, (ECF No. 107.)

5

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 59 provides, in pertinent part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court [.]" Fed. R. Civ. P. 59(a)(1)(A). As "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," district courts are "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Those grounds include (1) a verdict that is contrary to the weight of the evidence, (2) a verdict that is based on false or perjured evidence, (3) that damages are excessive, (4) to prevent a miscarriage of justice, (5) errors in evidentiary rulings, or (6) errors in jury instructions. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). A motion for a new trial is "confided to the discretion of the trial court, whose decision will be overturned . . . only for abuse of discretion." *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010) (citing *Philippine Nat. Oil Co. v. Garrett Corp.*, 724 F.3d 803, 805 (9th Cir. 1984)).

When considering a motion for new trial based on the alleged insufficiency of evidence supporting a jury verdict, the court "may grant a new trial only if the jury's verdict was against the clear weight of the evidence." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir.2009). "[T]he [] court has the duty ... to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729. Determining whether a jury verdict is against "the clear weight of the evidence" is a case-specific endeavor for which there is no easily articulated formula. *Id.* "The [court] can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Nevertheless, the court may not grant a new trial simply because the court would have arrived at a different verdict. *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042,

1046 (9th Cir.2009) (citing *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002)). The court should grant the motion for a new trial "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Constr., Co., Inc.*, 833 F.2d at 1371–72 (quoting 11 Wright & Miller, Fed. Prac. & Proc. § 2806, at 48–49).

## IV. DISCUSSION[2]

Plaintiff contends that the jury's verdict that housing Plaintiff with Dixon did not put Plaintiff at substantial risk of suffering serious harm was contrary to the law and against the clear weight of the evidence. (ECF No. 107 at 3-4.) Plaintiff argues that he presented compelling, uncontradicted evidence that (1) Dixon was a known "problem" inmate; (2) Dixon was involved in as many as seven altercations with inmates at the Jail during the six years he remained there; (3) Plaintiff and Dixon were separated from August 2012 to October 2014 – approximately twenty-six months by way of an administrative keep away order; (4) Dixon would not have had an opportunity to attack Plaintiff had the keep away orders remained in place; (5) Dixon did not like Plaintiff because Plaintiff "snitched" on him in August 2012 and (6) Dixon admitted to waiting for the right opportunity to attack Plaintiff in October 2014. *Id.*

Defendants contend that none of the evidence offered by Plaintiff contradict, or are inconsistent with, a finding that housing Dixon and Plaintiff together did not put Plaintiff at a substantial risk of suffering serious harm. (ECF No. 109 at 2). Defendants argue that no evidence was presented that a "problem inmate" is synonymous to a "dangerous inmate," and there was no evidence presented that Dixon was the aggressor in "seven altercations" involving fighting. Defendants further argue that Dixon's testimony that he was waiting for an

---

[2] Plaintiff argues that the court should consider only the jury's answer to "Question 1" on the special verdict form and should disregard the jury's subsequent answers as surplusage because they were provided in violation of the Court's express instructions on the special verdict form. Defendants agree with Plaintiff's argument. The argument is also supported by *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991) ("[S]pecial findings issued in violation of the trial court's express instructions do not constitute legitimate or viable findings of fact. The trial court must therefore dismiss them as surplusage, as a matter of law."). Accordingly, the Court will disregard any answers to Questions 2 through 6 on the special verdict form.

7

opportunity to attack Plaintiff was, as far as the evidence went, unknown to everyone but Dixon.

Based on the totality of the evidence, the Court finds that the jury verdict was not against the clear weight of the evidence. Both parties presented evidence at trial that Plaintiff and Dixon requested to be housed together. Plaintiff called Dixon as his first witness. Trial Tr. vol. 1 ("First Tr.") 98:5-6 June 19, 2018, ECF No. 105. During questioning, Plaintiff presented evidence that after the attack on October 25, 2015, Dixon made a spontaneous statement that he should not have been housed with Plaintiff because Plaintiff is a confidential informant against Dixon in a case. First Tr. 118:18-25. Dixon disputed that he made such a statement and testified that his making such a statement did not make sense. Specifically, Dixon testified as follows:

> Q But you have no reason to dispute that you did say it?
> A Only reason I'm disputing it is because I don't
> remember his name, but the guy in the -- I remember him
> coming to my door and asking me if -- if I wanted to cell up
> with Franks, and he went to Franks, and he asked him if he
> wanted to cell up, and we both said yeah, and he celled us
> up. So that's statement doesn't even -- don't make no
> sense. That's why I don't --

First Tr. 118:18-25.

On cross-examination, Dixon further explained that Plaintiff initiated the housing request, testifying as follows:

> Q. Okay. Back in October of 2014, were you in the SHU?
> A In the max unit, yeah, the SHU.
> Q Okay. And did Deputy Wigt come to you one day and ask if you
> were okay with sharing a cell with Franks?
> A He did.
> Q And you told him you were?
> A Yeah. He came to the door and -- well, he came in the unit. I
> think he was working the block that day. I mean, I'm sorry, the
> unit, and he was doing his rounds, and Mr. Franks had stopped him
> first, and then he came to me and asked me, and we both said yeah.
> Q Okay. And obviously Mr. Franks was in the same unit, right?
> A Yeah.
> Q Different cells?
> A It was a pod, a pod.
> Q Okay.

8

> A A pod, yeah.
> Q A pod. Could you guys communicate back and forth?
> A Yeah, all the time.
> Q Okay. And during these communications, did you and Mr. Franks talk about or say something about "We should cell together," something to that effect?
> A Yeah, quite a few times.
> Q Okay. After -- did he come into your cell?
> A Yes.

First Tr. 125:14-126:14.

Defendants presented further evidence that Dixon and Plaintiff asked to be housed together. Defendants offered the Stanislaus County Sheriff's Department Remarks History or "G Screen" for Plaintiff and for Dixon, both of which have an entry by Defendant Wigt. Defendant Wigt testified as to the contents of the entry as follows:

> Q Okay. Who made that entry?
> A I did.
> Q And what does that entry say?
> A It says --
> Q Go ahead and read it.
> A: "Franks talked to me today in Housing Unit B, stating that him and Dixon wanted to house together. I told him that I thought they didn't like each other. He said they are good now, and they will house together with no problems. I confirmed this with Dixon. I will take the keep-aways off and house them together."
> Q Okay. And if you'd take a look at Exhibit 7, which is the Dixon G Screen. Is there an entry for October 4 of 2014?
> A Yes.
> Q And is that entry similar to the entry you just read?
> A Yes.
> Q When did you enter that information?
> A On that date, 10/4/14.

Trial Tr. vol. 2 ("Second Tr.") 55:12-20 June 20, 2018, ECF No. 106. Defendant Wigt further testified that he made the entry on October 4, 2014, and the date of entry cannot be changed. Second Tr. 56:2-11.

The jury was instructed to decide how much weight to give to any evidence. Although Plaintiff testified that he did not request to be housed with Dixon, *see* Second Tr. 6:22-7:8, the jury could have found Plaintiff's testimony not credible. Instead, the jury could have

9

reasonably found credible the testimony of Dixon and Defendant Wigt as well as the documentary evidence offered by Defendants.

Plaintiff further argues that even if the jury found the testimony of Dixon and Defendant Wigt credible, a risk of harm is not reduced simply because an inmate requests that very same risk. Plaintiff contends that the risk of harm is to be measured by the environment to which the Plaintiff entered, not by the mere fact he requests it. However, the jury could have reasonably concluded that because Dixon and Plaintiff had "squashed" their prior disagreement and requested to be housed together, Plaintiff did not face a substantial risk of suffering serious harm at the time they were housed together.

Defendants offered evidence that it was common for inmates to "squash" their disagreements with each other. For example, Defendant Wight testified as follows:

> Q You heard -- I'm not sure who mentioned it. It might
> have been Sergeant Mauldin -- the term "squashed"?
> A Yes.
> Q What does that mean?
> A It means resolving an issue, like your issue is over
> with, squashed.
> Q Okay. And are there -- is it common in jail for
> inmates to have issues with each other?
> A Yes, all the time.
> Q Okay. And is it also common that it's -- these issues
> are, as you say, squashed or they've worked it out somehow?
> A Yes, that happens all the time.
> Q . . . . How often are keep-aways removed, just in your ordinary
> daily business as a classification officer?
> A Daily, every month.

Second Tr. 60:3-18. Defendant Mauldin also stated that inmates often overcame prior disagreements, testifying as follows:

> Q Sergeant, just briefly, how many times do you deal as a
> classification officer with squashes?
> A I wouldn't say daily but probably once a week or so,
> something like that, once or twice a week.
> Q So is it not uncommon that inmates patch things up and
> get along?

A No. It's very common.

Second Tr. 76:3-9.

Plaintiff himself said that he believed that he and Dixon had moved past their prior disagreement. Plaintiff testified as follows:

> Q Did Sergeant Wigt talk to Mr. Dixon when you were moved?
> A Yeah, he just said this here is your cell mate. You guys have to get along.
> Q Did Mr. Dixon say anything to Sergeant Wigt?
> A No, he didn't.
> Q Then what happened next?
> A Then they left, and me and Dixon had talked, and he apologized and everything. So I just kind of rolled with the program.
> Q Even though Dixon had apologized to you that day on October 14th -- October 4th of '14, did you believe him?
> A Yeah, I did.
> Q And even though you believed him, did it make you uncomfortable being in the cell with him?
> A Yes.
> Q Why?
> A Because I wasn't -- I wasn't positive something couldn't happen again like that.
> Q You had snitched on him too, right?
> A Yes.
> Q Were you worried that he would attack you for being a snitch?
> A Yeah. I did, but when he apologized, I kind of – kind of believed him and let it go.

Second Tr. 17:2-18:1.

Furthermore, the jury was instructed to determine the weight and effect of the evidence at trial. Dixon testified that he harmed Plaintiff because he learned that Plaintiff had written letters to Dixon's family requesting money and had written letters to Dixon's girlfriends. First Tr. 112:14-16; 13:121; 5-13. Dixon's testimony is unclear as to when he learned of this information. First Tr. 105:11-16; 121:5-18. Nevertheless, Plaintiff and Dixon were housed together for three weeks before Dixon harmed Plaintiff. Defendants presented evidence that

prison cellmates spend 24 hours a day together in a six by eight cell with only an hour a day for showering or recreation. Second Tr. 79:18-80:2. In weighing and giving effect to the evidence, the jury could have reasonably concluded that housing Plaintiff with Dixon did not put Plaintiff at a substantial risk of suffering serious harm because Dixon and Plaintiff were congenial for three weeks before Dixon harmed Plaintiff.

The jury verdict is, thus, not contrary to the clear weight of the evidence. Accordingly, Plaintiff's motion for a new trial is denied.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the jury's verdict is not contrary to the clear weight of the evidence presented at trial, and Plaintiff's motion for a new trial, (ECF No. 107), is denied.

IT IS SO ORDERED.

Dated: **October 17, 2018**

/s/ *Erin P. Grosjean*
UNITED STATES MAGISTRATE JUDGE